## UNITED STATES v. BUTLER HOTEL CO., Inc., et al.

District Court, W. D. Washington, N. D. March 23, 1929.

On Further Hearing, April 8, 1929.

No. 636.

Anthony Savage, U. S. Atty., and Paul D. Coles and Tom De Wolfe, Asst. U. S. Attys., all of Seattle, Wash.

George F. Vanderveer, of Seattle, Wash., for defendants.

NETERER, District Judge (after stating the facts as above). This is an action in rem. The purpose of the Eighteenth Amendment is to prevent the use of intoxicating liquor as a beverage. It is not self-executing, but is given vitality by the National Prohibition Act. The provisions of this act are to be liberally construed, "to the end that the use of intoxicating liquor as a beverage may be prevented." Section 12, 27 USCA. The possession of liquor by a person not legally permitted to have it is prima facie evidence that such liquor is kept for sale or barter. Section 50, 27 USCA. There is no contention that any of the liquor in issue in the possession of patrons or the bottles in the cupboard and the cashier's desk in this room, or waiters' closet, was lawfully possessed.

"Any room * * * where intoxicating liquor is * * * sold, kept, or bartered * * * is * * * a common nuisance." Section 33, title 27 USCA. And upon proof sustaining the charge the court must abate it, and may order the room closed for one year. Section 34, 27 USCA. Did the customary and habitual transportation of liquor to the dining room, and the consumption thereof in the room by the persons who possessed it, and by those to whom it was furnished by them, and the bottles of liquor in the cupboard and in the cashier's desk, and one bottle in the waiters' coat in the waiters' dressing room, constitute a keeping, within the provisions of section 33, supra, and the Rose Room a nuisance?

The contention of the defendant that the room was patronized by "high-class" and "some of the best people in the city" is immaterial. The law is no respecter of persons. It is immaterial whether liquor was

taken there "in large silver flasks" by men in full dress, or in bottles by men wearing corduroys, or carried in demijohns by men wearing overalls, or vice versa. Clothes and containers, or social status, are immaterial.

It may be concluded from the evidence that the management of the hotel endeavored to conduct a "high-class" place for entertainment, where intoxicating liquor possessed by persons could be brought and by them "furnished" to others for consumption in the Rose Room, and that it did exercise diligence on special occasions in keeping intoxicated persons therefrom. The recognized necessity for employing detectives or guards at the entrances to keep out intoxicated persons strongly emphasizes the notoriety the room enjoyed after the regular dinner hour.

▮▮ "Kept" (imp. and p. p. of "keep," Webster's Int. Dict.), as used, is significant. The section does not require the management to keep the liquor, but if it was "kept" by any person in this room, in violation of the section, supra, the room offended. Nor is knowledge of the owner necessary. United States v. Studio Club (D. C.) 12 F.(2d) 462; United States v. Auto City Brewing Co. et al. (D. C.) 5 F.(2d) 362; United States v. Boynton (D. C.) 297 F. 261; United States v. Marhold (D. C.) 18 F.(2d) 779; Farrell v. United States (C. C. A.) 21 F.(2d) 318; Engler v. United States (C. C. A.) 25 F.(2d) 37. But in this case knowledge is apparent. It is shown beyond question that liquor was possessed in this room by numerous patrons, and four bottles found in the cupboard and desk in the room, and one bottle in the waiters' room off the Rose Room, and that patrons habitually brought liquor to this room, and it was kept by such persons by permission of the management, or at least such conduct as gave the place a general reputation as a place where intoxicating liquor could be taken and consumed, and be "furnished" for immediate consumption to members of parties who were entertained.

The evidence discloses that by conduct the management and patrons created a pecuniary beneficial and profitable relation having a commercial aspect as to the hotel, and convenience and pleasure to the patrons and friends, who desired to consume liquor. One thing was given for another, as in barter, or a privilege was granted for money, as in sale. The hotel had the room and "furnishings," etc. The patrons had, or purchased, the liquor, and had friends they desired to serve. By general repute there was open invitation that intoxicating liquor might be brought and kept by the patrons in this room to be consumed, and "furnished" to guests for consumption in the room by paying a "cover charge" of $1.25 on Saturday nights, $1 on Thursday nights, and 75 cents on other nights, in addition to paying for service of ginger ale, "white rock," etc., and cracked ice. There was a pecuniary benefit, and, no doubt, profit to the hotel, in the payments made, and a satisfaction to the patrons for permission to keep liquor for immediate consumption, and "furnish" liquor to guests in this room for like purpose.

The hotel company, to rebut the element of profit from liquid sale and ice, presents a statement of income from sales of food and fountain (liquids) for three months for 1925, 1927, 1928, and four months for 1926, totaling $153,852.21 for food, and $30,307.85 for fountain. The per cent. for food, 83.52; and fountain, 16.48. The evidence of the plaintiff's witnesses, however, was limited to after 11 o'clock p. m., when the service was nearly exclusively cracked ice and ginger ale, etc., and little, if any, food served. The statement includes luncheon and dinner for the full days, and the evidence shows that many are served in this dining room during the lunch and dinner hours with food, but the ginger ale, etc., and cracked ice, was not in demand until after the dinner hour, when it was almost exclusively served. The statement is therefore of no service.

The keeping of the liquor in the room for the disclosed purposes was unlawful, and the possession prima facie evidence that it was kept for sale, and some of it was delivered to others. May the delivery under the disclosures in the record be conclusive of sale as a consummation of the purpose for which it was kept, in the absence of evidence to the contrary, under the liberal interpretation required by the Congress? But whether so considered or not, and though kept for a brief time extending from less than one hour to two or three hours, the transaction has a commercial aspect, and liquor kept as disclosed, in this room, is denounced by section 33, supra.

In Street v. Lincoln Safe-Dep. Co., 254 U. S. 88, 41 S. Ct. 31, 65 L. Ed. 151, 10 A. L. R. 1548, the liquor was lawfully possessed, and that the conclusion there reached has no application to the facts as here disclosed, is clearly indicated by the refusal of the Supreme Court to review Fritzel v. United States, 275 U. S. 532, 48 S. Ct. 29, 72 L. Ed. 411.

"Kept," in its relation here, does not imply time, as contended by the defense. Time is not essence of the offense. It may

emphasize the act. The disclosed possession is keeping for the purpose of delivering it to others for consumption, for which a pecuniary consideration is paid to the management as "cover charge," and service of cracked ice in glasses, for which payment is made, is no doubt clearly within the inhibition, and was so held in Fritzel v. United States (C. C. A.) 17 F.(2d) 965, and this holding was approved by the Supreme Court in 275 U. S. 532, 48 S. Ct. 29, 72 L. Ed. 411. See, also, Rossi v. United States (C. C. A.) 16 F.(2d) 712; United States v. Budar (D. C.) 9 F. (2d) 126; United States v. General Amusement Co. (D. C.) 19 F.(2d) 630; United States v. Kelly (D. C.) 24 F.(2d) 133. The legal relation and application of the word "kept" in these cases is not differentiated from the facts in this case. The conduct of the patrons may have been more flagrant in some of those cases, but that does not change the legal aspect of "kept" in the relation used.

The management of the hotel was a participant in the relation by its conduct, and had actual knowledge of the conduct of the patrons, and did exert itself in excluding from the room objectionable characters so that the guests would be of a more "select type." Many prominent professional and business men were examined by the defense, but nearly all of them patronized the Rose Room for luncheon and for dinner only, and many departed before or soon after the regular dinner hour.

It is also obvious that keeping the bottles in the cupboard and desk in this room, under all the circumstances, in connection with the liquor found in the room, the empty bottles removed by some of the waiters, and the conduct of the waiters and bell boys in co-operation with patrons of the room, as testified by some of the agents, had only one purpose, and the irresistible conclusion is that the liquor was kept for sale. The room had acquired a reputation as a place where liquor could be taken and consumed, and it would naturally attract persons having and desiring to imbibe liquor with others, and some seeking to acquire it for the same purpose, and to supply such demand these bottles, and the bottle in the waiters' room, were no doubt "kept." See Gentili v. United States (C. C. A.) 22 F.(2d) 67. The "Rose Room" is a nuisance, under the circumstances. Singer v. United States (C. C. A.) 288 F. 695, supports, rather than controverts, this conclusion.

The manager testified that when he took charge in 1918 (the act was approved October 28, 1919) the place was "quite bad," but he had frequently discharged employees, and had given strict orders against use of liquor in the "Rose Room," and had been doing his utmost to overcome this condition, and he thought that he had done so; but the evidence is to the contrary, and it is a matter of regret that he has not succeeded, and viewing the statute as not in any sense a proceeding in personam, but solely in rem to prevent continuance or recurrence of a public nuisance, and the manager having stated that he had been doing his utmost to overcome the situation, and the evidence showing that he has failed, under these circumstances, an order to restrain for one year further operation of this room in the manner in which it has been conducted must be entered, to accomplish an effectual abatement of the existing nuisance.

While this room is a nuisance within the provisions of the law, there is no evidence which reflects discreditably upon the hotel as a hotel. The transgressing bell boys were immediately discharged, and there is no evidence connecting the management of the hotel with selling or possessing liquor in this hotel. The conduct in the Rose Room, so far as disclosed, appears regular prior to the end of the dinner hour, 9 o'clock p. m.

Shall the court direct the marshal to padlock the entrances to the dining room, or shall the room be permitted to remain open until the end of the dinner hour, under bond of the management, conditioned as provided by law, that liquor will not be sold, kept, bartered, or consumed on the premises, and the room be closed at 9 o'clock p. m. of each day for one year? To this end the cause will be assigned for hearing on April 1, 1929, at 2 o'clock p. m.

## On Further Hearing.

This is the way the matter presents itself to me. The Rose Room, at the issuance of the restraining order by Judge Norcross, July 6, 1928, it is established, was a nuisance. There is no evidence of change, but the contrary is established. The management has not shown its ability or disposition to remedy it.

The nuisance must be effectually abated by padlocking its entrances for one year. The public purpose of the National Prohibition Act is to give vitality to the Eighteenth Amendment, by carrying forward the express wish of the Legislatures of 46 states in adopting it, and the conviction of millions of United States citizens in what is conceived to be for the public good, and a denial of

the execution of this law is of itself irreparable injury, as was said by Circuit Judge Hand from the Second Circuit.

The closing of the dining room will no doubt create a definite financial loss to the defendants, if there is any profit in its operation, and its close have influence upon the hotel, by destroying facility for the accommodation of its patrons at meals. This loss is irreparable, but the loss attributable to lawful enterprise would be practically all because of the close prior to 9 o'clock p. m. Material profit, mingled with gain from prohibited unlawful conduct, within the provisions of sections 33 and 34, 27 USCA, may not outweigh public moral welfare and civic righteousness.

It seems to me that the injury may be obviated, within the discretion given the court by section 34, title 27, USCA, by permitting the dining room to be open for luncheon and dinner (no breakfast, it is shown, being served), and used by the owner until the close of the dinner hour. The contention of the government that the room must be closed or open, and, being a nuisance, it must be closed, I think, is too restrictive. There is no evidence that any liquor was used or consumed, or circumstances of sale, service of cracked ice, ginger ale, or "white rock," etc., until after the dinner hour, 9 o'clock. The presumption is that, having found liquor in the room, it was "kept," etc., in this room, and that it was "kept" the whole day; but the intent of the Congress in lodging discretion in the court was to remedy an existing evil in the most practical way, by the application of common sense and good conscience. The chancellor undoubtedly has power, in the interest of justice and right, to exercise discretion, to the end that the nuisance be abated with the least injury to the defendants.

The room being decreed a nuisance, and a decree for injunctive relief not being suspended by allowance of appeal (Slaughter-House Cases, 10 Wall. 273, 19 L. Ed. 915), and the court having the power, it, said Justice Bradley, in Hovey v. McDonald, 109 U. S. 150, at page 161, 3 S. Ct. 136, 143 (27 L. Ed. 888), "should always be exercised when any irremediable injury may result from the effect of the decree as rendered; but it is a discretionary power. * * * *"

A formal decree may be prepared and served on opposing counsel, containing the usual provisions in such cases, and that the room shall not be occupied or used for one year from the date of the decree, but that the defendants may, by filing a bond in the sum of $1,000 fixed by statute, with the usual conditions, and that the Rose Room will be closed from 9 o'clock p. m. to 9 o'clock a. m., or the decree is superseded by the Circuit Court of Appeals, or a judge thereof, on or before April 22, 1929, the marshal shall padlock the entrances of the Rose Room in issue for one year—the decree to be presented to the court for entry at 10 o'clock a. m. on the 15th day of April, 1929, or as soon thereafter as it can be considered by the court.